IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JACQUELINE PACKARD, | : | CIVIL ACTION |
| | : | |
| Claimant, | : | |
| | : | |
| v. | : | |
| | : | |
| MICHAEL J. ASTRUE, | : | No. 11-7323 |
| Commissioner of Social Security, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM ON REQUEST FOR REVIEW**

**Baylson, J.**                                                                                                                  **October 4, 2012**

Claimant Jacqueline Packard seeks judicial review of a decision by the Commissioner of the Social Security Administration ("the Commissioner") denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-33, 1381-83(f). After careful consideration of all the relevant facts and circumstances, and for the reasons explained below, Packard's request for review of the July 19, 2010 decision of the Administrative Law Judge ("ALJ") is DENIED.

**I.      Background and Procedural History**

On December 13, 2008, Packard filed an application for SSI, alleging disability based on mental impairments that limit her ability to concentrate and follow instructions. (Tr. 111) On July 19, 2010, the ALJ issued an unfavorable decision regarding Packard's application, concluding that although Packard suffers from severe impairments (i.e., depression and panic disorder), her impairments do not preclude her from performing low-skilled jobs that are

1

available in the national economy. (Tr. 14-23.) Packard requested review of the ALJ's decision by the Appeals Council; this request was denied on September 22, 2011. Packard thereafter commenced the instant action.

## II.  Legal Standards

### A.  Jurisdiction

The Social Security Act provides for judicial review by this Court of any "final decision of the Commissioner of Social Security" in a disability proceeding. 42 U.S.C. §§ 405(g), 1383(c)(3). A district court may enter a judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." Id.

### B.  Standard of Review

On judicial review of the Commissioner's decision, the Commissioner's findings of fact, "if supported by substantial evidence," are conclusive. Id. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Smith v. Comm'r of Soc. Sec., 631 F.3d 632, 633 (3d Cir. 2010) (internal quotation marks omitted). It is a standard requiring "less than a preponderance of the evidence but more than a mere scintilla." Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004).

In reviewing the record for substantial evidence, however, the Court must "not weigh the evidence or substitute [its own] conclusions for those of the fact finder." Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005) (internal quotation marks omitted).

The Court's review of the legal standards applied by the ALJ is plenary. See Allen v. Barnhart, 417 F.3d 396, 398 (3d Cir. 2005).

**C.     Disability Claims Analysis**

The Social Security Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, an ALJ "must perform a five-step, sequential analysis." Smith, 631 F.3d at 634 (citing 20 C.F.R. § 404.1520). If the claimant is not engaged in substantial gainful activity (step 1) and has a severe impairment (step 2), the ALJ must determine at step 3 whether the impairment meets or equals the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(d), 416.920(d). Where, as here, the ALJ determines that the claimant's condition does not satisfy one of the listed impairments, the ALJ must conduct an assessment (step 4) of the claimant's "residual functional capacity" (RFC) to meet the physical and mental demands of her past relevant work. 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). If the ALJ determines, as here, that the claimant does not retain the RFC to perform past relevant work, the ALJ must determine (step 5) if there is other work in the national economy that the claimant can perform (considering her RFC, age, education, and past relevant work experience). 20 C.F.R. §§ 404.1520(g), 416.920(g). If the ALJ determines, as here, that the claimant can perform work that is available in the national economy, the disability claim is denied.

**III.    Discussion**

At issue in this case is the ALJ's determination that Packard has the RFC to perform low-skilled jobs in the national economy. Packard contends the ALJ erred by: (1) failing to specifically address four of her GAF ("global assessment of functioning") scores, including four

that indicated serious mental impairment; (2) not properly weighing the opinion of her treating psychiatrist, Dr. D.S. Mahajan; and (3) not conducting an individualized inquiry into her ability to handle the stresses of employment.  Based on the individual and collective effect of these deficiencies, Packard contends the ALJ's decision is not supported by substantial evidence.  For the reasons set forth below, the Court disagrees.

**A.     GAF Scores**

Packard argues that we should reverse or remand this case due to the ALJ's failure to expressly reference four of Packard's GAF scores that indicated serious mental impairment.  This omission, however, does not warrant the remand that Packard seeks.

A GAF score is an accepted means by which mental health professionals "assess current treatment needs and provide a prognosis."  66 Fed. Reg. 50746, 50764-65 (2000).  Although the Social Security Administration has ruled that GAF scores do not have a "direct correlation to the severity requirements" used for disability determinations, id., GAF scores constitute relevant medical evidence that "must be addressed by an ALJ in making a determination regarding a claimant's disability."  Colon v. Barnhart, 424 F. Supp. 2d 805, 812 (E.D. Pa. 2006); see generally Fargnoli v. Massanari, 247 F.3d 34, 41 (3d Cir. 2001) (stating that ALJ must consider "all relevant evidence when determining an individual's residual functional capacity").  Accordingly, this Court has repeatedly found error and remanded where the ALJ failed to address GAF scores indicating serious mental impairment.  Watson v. Astrue, No. 2009 WL 678717, at *6 (E.D. Pa. March 13, 2009) (citing cases).  There is no formalistic rule, however, that requires this Court to remand a case when an ALJ fails – without more – to specifically mention a low GAF score.  This conclusion is supported by the Third Circuit's opinion in Gilroy v. Astrue, 351

F. App'x 714 (3d Cir. 2009) (nonprecedential). In Gilroy, the Third Circuit held that the ALJ's failure to explicitly reference the claimant's GAF score of 45 did not warrant a remand because the doctor who issued the score did not "'express any opinions regarding specific limitations' or otherwise . . . explain the basis for his GAF rating." Id. at 716.

While Gilroy is a nonprecedential opinion, our own cases do not support the formalistic rule that claimant espouses. Rather than require remand for the mere failure to explicitly reference GAF scores, our cases have addressed situations where ALJs provided no meaningful indication of whether they even considered the scores, let alone their basis for discrediting them.[1] Our GAF cases are thus consistent with the well established rule that an ALJ's disability determination must "be accompanied by a clear and satisfactory explication of the basis on which it rests." Fargnoli, 247 F.3d at 41 (quoting Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)).

---

[1] See West v. Astrue, No. 09-2650, 2010 WL 1659712, at *6 (E.D. Pa. Apr. 26, 2010) ("[T]he ALJ failed to disclose any reasons for not considering the five GAF scores of 50 or below received by Plaintiff."); Nieves v. Astrue, No. 08-5178, 2010 WL 629831, at *5 (E.D. Pa. Feb. 19, 2010); (ALJ "gave no explanation for discounting the significance of [the] GAF scores"); Nelson v. Astrue, No. 08-4785, 2009 WL 1871965, at *7 (E.D. Pa. 2009 June 26, 2009) ("[T]he ALJ's opinion provides no indication whether he considered these scores, or any specific reasons for discounting their significance."); Watson, 2009 WL 678717, at *5 ("[T]he ALJ's opinion provides no indication as to whether she considered these scores, or reasons for discounting their significance."); Glover v. Astrue, No. 07-2601, 2008 WL 517229, at *1 (E.D.Pa. Feb.27, 2008) ("The ALJ failed to mention the GAF scores or explain his rejection of them."); Salgado v. Astrue, No. 06-3119, 2007 WL 2404713, at *1 (E.D. Pa. Aug. 13, 2007) ("Despite the severity of the assessed GAF scores, the ALJ never explained her basis for rejecting them."); Colon, 424 F. Supp. 2d at 813 ("[T]he ALJ was required to discuss his reasons for not even considering the two GAF scores of 50."); Dougherty v. Barnhart, No. 05-5383, 2006 WL 2433792, at *10 n.4 (E.D. Pa. Aug. 21, 2006) ("[A]n ALJ must state reasons for discounting relevant medical evidence, including GAF scores."); Span ex rel. R.C. v. Barnhart, No. 02-7399, 2004 WL 1535768, at *6-7 (E.D. Pa. May 21, 2004) ("Absent from the ALJ's discussion is any meaningful indication of how he considered these GAF scores or discounted their significance."); Escardille v. Barnhart, No. 02-2930, 2003 WL 21499999, at *6 (E.D. Pa. June 24, 2003) ("The ALJ decision is void of any reasoning or justification for rejecting the treating physician's opinion.").

A clear and satisfactory explication entails not only "an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected." Cotter, 642 F.2d at 705.

Based on Gilroy and our own cases, Packard's claim will fail if, either: (1) the doctors who issued the GAF scores did not "express any opinions regarding [her] specific limitations," or, (2) if the ALJ provided a clear and satisfactory explanation of the basis upon which he dismissed the probative weight of the omitted GAF scores.

As Packard correctly points out, the ALJ failed to specifically reference four of her GAF scores that indicated serious mental impairment. The ALJ only referenced two of Packard's GAF scores: a score of 55 that she received in October 2007 from her treating physician, Dr. Mahajan, and a score of 50 that she received in January 2010 following treatment at Mercy Fitzgerald hospital for an overdose of sleeping pills. GAF scores between 41 and 50 indicate "[s]erious symptoms OR any serious impairment in social, occupational, or school functioning," while scores between 51 and 60 indicate "[m]oderate symptoms OR any moderate difficulty in social, occupational, or school functioning." DSM IV-TR at 34.

Left unmentioned by the ALJ were two scores of 25, as well as two additional scores of 50. A GAF score of 21 to 30 refers to behavior that is "considered influenced by delusions or hallucinations OR serious impairment in communications or judgment OR inability to function in all areas." Id. Packard received her two scores of 25 upon two separate admissions to the hospital (in May 2009 and April 2010) for suicidal ideations. (Tr. 167, 462.) On both occasions, Packard's GAF score promptly improved (to 55 and 50) after a few days of inpatient care. (See Tr. 167, 451.) Although the ALJ discussed both of these hospitalizations, he did not mention

6

Packard's GAF scores during these occasions. Nor did he mention Packard's GAF score of 50 that she received on January 27, 2010 (although, as mentioned earlier, he did reference the GAF score of 50 that was issued just two days later). (Tr. 430.)

Under Gilroy, the ALJ's failure here to specifically reference four of Packard's low GAF scores does not require remand because none of the doctors issuing these scores identified any specific limitations relevant to Packard's RFC. In the records accompanying the scores, (tr. 166-69; 430; 462) the doctors provide only general diagnoses (e.g., "depression" and "substance abuse"), and fail to provide any observations of specific limitations relevant to an RFC assessment. See Sojourner v. Astrue, No. 09-5662, 2010 WL 4008558, at *5 (E.D. Pa. Oct. 12, 2010) (interpreting Gilroy's reference to "specific limitations" as referring to RFC-relevant observations such as "an inability to carry out instructions or make simple judgments").

Further, unlike the GAF cases this Court has previously addressed, the ALJ provided a clear explanation for why he was discounting Packard's low GAF scores. The ALJ noted that he "does not place significant weight on numerical scores when they are not supported by the evidentiary record, and fail to consider medical improvement following appropriate treatment." (Tr. 17). Immediately after stating this, the ALJ discussed Packard's hospitalizations in May 2009, January 2010, and April 2010 (i.e., the three events that triggered the four omitted GAF scores) and observed that all three occurred while Packard was non-compliant with her medications and using alcohol and/or cocaine. (Id.) Elsewhere in the opinion, the ALJ discussed the lack of objective evidence that Packard's RFC is severely limited on an "ongoing" basis. (Tr. 18, 20-21) When read in context, this Court has no trouble discerning a clear and satisfactory explication for why the ALJ chose to discredit Packard's low GAF scores: (1) they were issued

during periods when the claimant was non-compliant with her medication, (2) they quickly improved following appropriate treatment, and (3) they are inconsistent with the evidence in the record (discussed below) concerning claimant's ongoing daily activities.  Since the ALJ's basis for discrediting the low GAF scores is readily discernible, a remand "solely so the ALJ can insert the GAF scores into his decision" would amount to the kind of pointless "ping-pong game" that judicial review of agency action should avoid.  Coy v. Astrue, No. 08-1372, 2009 WL 2043491, at *14 (W.D. Pa. July 8, 2009) (quoting NLRB v. Wyman-Gordon Co., 394 U.S. 759, 766 n.6 (1969)).

**B.     Treating Physician's Opinion**

The Court now addresses Packard's contention that the ALJ erred by failing to give due weight to the opinion of her treating physician, Dr. Mahajan.  Packard argues that Dr. Mahajan's assessment (i.e., that she has marked and severe limitations in her ability to carry out the functions necessary for low-skill employment) should have been given controlling weight, particularly since it was based on information unavailable to the state agency psychologist, Dr. Anthony Galdieri, whose opinion the ALJ placed "great weight."  (Tr. 17.)  Based on a careful review of the record, I find no error in the ALJ's weighing of these two opinions.

In all cases containing contrary opinions from medical doctors, ALJs must determine what weight to give to each.  See Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) ("The ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations."); see also Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505 (3d Cir. 2009) (stating that ALJ is "free to choose the medical opinion of one doctor over that of another").  In doing so, one factor ALJs should consider is the nature of the relationship (e.g.,

treating, nontreating, or nonexamining physician[2]) between the doctor and the claimant. 20 C.F.R. § 404.1527(c)(2). Although "[t]reating physicians' reports should be accorded great weight," Plummer v. Apfel, 186 F.3d at 429, they are only accorded controlling weight if "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with other substantial evidence [in the] case record." Smith v. Astrue, 359 F. App'x 313, 316 (3d Cir.2009) (alteration in original) (quoting 20 C.F.R. §§ 404.1527(d)(2)). Opinions of state psychologists also "merit significant consideration as well" due to their expertise in what constitutes a disability for social security purposes. Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2012).

In addition to considering the treatment relationship, an ALJ should consider the degree to which a doctor's opinion is backed by supporting explanations, Plummer, 186 F.3d at 429; 20 C.F.R. § 404.1527(c)(3), and the degree to which it is consistent with evidence in the record, 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").

In the instant case, the opinion of the treating psychologist (Dr. Mahajan) that is at issue is a June 2010 "Medical Source Statement of Ability to Do Work Related Activities (Mental)." The Statement, a form questionnaire primarily comprised of fill-in-the-box questions, addresses

---

[2] A nontreating source is a physician, psychologist, or other acceptable medical source who has examined the claimant but does not have, or did not have, an ongoing treatment relationship with the claimant. 20 C.F.R. §§ 404.1502, 416.902. Opinions from nontreating sources do not carry as much weight as treating source opinions, but are generally entitled to more weight than nonexamining sources. See Solter v. Comm'r of Soc. Sec., No. 09-2821, 2010 WL 3620213, at *7 (E.D. Pa. Aug.6, 2010). A nonexamining source is a physician, psychologist, or other acceptable medical source who has not examined the claimant but provides a medical or other opinion. 20 C.F.R. §§ 404.1502, 416.902.

two issues: (1) the claimant's ability "to understand, remember, and carry out instructions," and (2) the claimant's ability "to respond appropriately to supervision, co-workers, and work pressures in a work setting." (Tr. 531-32).  In checking the boxes on this form, Dr. Mahajan listed Packard as having "extreme" limitations in understanding, remembering, and carrying out detailed instructions; interacting appropriately with supervisors; and responding appropriately to changes in a routine; as well as "marked" limitations in making judgments on simple work-related decisions, interacting appropriately with the public, and responding appropriately to work pressures in a usual work setting.  (Id.)

Although Dr. Mahajan's conclusions, if accepted, would have entitled Packard to a disability determination,[3] he provided a very sparse explanation for his assessment, noting only that Packard has "chronic depression/stress," has not been able to "hold [a] job more than 3-4 weeks," and has "repeated panic episodes."  (Id.)  Further, as the ALJ pointed out, Mahajan's assessment is inconsistent with other evidence in the record.  (Tr. 18).  The ALJ observed, for example, that the claimant herself made no mention of having panic attacks during her consultative examination with a state psychologist in February 2009, and that Mahajan had previously diagnosed the claimant as having a GAF score of 55, thus indicating only "moderate" impairments.  (Id.)

Mahajan's assessment is also at odds with the February 2009 assessment of Dr. Galdieri (the state agency psychologist).  Dr. Galdieri concluded Packard was "not significantly limited" in her abilities to understand, remember, and carry out instructions; interact appropriately with

---

[3] When the ALJ incorporated Mahajan's assessment into the hypothetical question he posed to the vocational expert (VE), the VE stated that Packard would not be qualified to work in low-skilled positions.

the public and co-workers; and respond appropriately to changes in the work setting.  (Tr. 162-63.)  Although Dr. Galdieri concluded Packard had "moderate" limitations in her ability to both maintain attention and concentration and respond appropriately to criticism from supervisors, he concluded she "is able to meet the basic mental demands of competitive work on a sustained basis."  (Tr. 162-64.)  While Galdieri "did not examine the claimant," the ALJ noted that he "provided specific reasons for his opinions about the claimant's limitation" which "were well grounded in the evidence of record." (Tr. 17-18).

In her appeal to this Court, Packard argues the ALJ erred by giving more weight to Galdieri's report than Mahajan's, since Galdieri – having written his report in February 2009 – was not able to consider recent developments that bear upon the nature of Packard's condition. As the Third Circuit has recently made clear, however, the fact that one expert's report was issued prior to another's is, of itself, insignificant.  Chandler, 667 F.3d 360-61.  While the Third Circuit recognized that new evidence could undermine an ALJ's reliance on an old opinion, see id. at 362-63, the new evidence of Packard's condition that emerged following Galdieri's opinion (e.g., the three hospitalization events that occurred from May 2009 to April 2010 with their accompanying low GAF entry scores) does not, as Packard contends, undermine the ALJ's reliance on Galdieri.

As discussed earlier, the ALJ gave little weight to the hospitalization events that occurred after Galdieri's report because they occurred during periods where Packard was both non-compliant with her medication and using either alcohol or cocaine.  (Tr. 17.)  Further, the ALJ provided reasons to discredit the probative value of the low GAF scores.  First, the ALJ noted that there is no evidence in the record that Packard has ever suffered from the effects typical of a

GAF score between 21 to 30 (e.g., hallucinations). (Id.) Second, the ALF noted that GAF scores are "highly subjective appraisals, which rely primarily on an individual's own description of her functioning level." (Id.) This is significant because, as the ALJ repeatedly stressed, there is evidence in the record that casts doubt on the reliability of Packard's self-assessments of her condition. (Tr. 17, 20-21). For example, Packard stated during the hearing that she only babysat her grandchildren during emergencies. (Tr. 33). Previously, however, she had stated on at least two occasions that she babysat her grandchildren on a daily basis from nine in the morning until five to eight at night. (Tr. 106; 147). Further, although Packard claimed that she suffers from agoraphobia, (tr. 33), the ALJ noted that "she is able to walk and take public transportation to her weekly and monthly treatment sessions, use the laundromat, and go to Wawa. . . . The record also shows emergency treatment for car accidents as well as falls, indicating that the claimant is not confined to her home." (Tr. 20.)

Finally, the ALJ determined that Galdieri's assessment of mild to moderate limitations is consistent with Packard's ongoing daily activities, including her babysitting activities up through, at least, January 2010; her ability to manage her financial affairs and perform routine household chores like cleaning and laundry; and her use of public transportation, public facilities, and attendance at weekly group therapy sessions.

Taken together, the ALJ articulated sufficient reasons to justify its decision to give more weight to Galdieri's assessment than Mahajan's.

## C.     Claimant's Ability to Handle Stress

Packard also alleges that the ALJ erred by failing to conduct an individualized inquiry into her ability to handle the various types of stresses associated with employment. Packard

bases this contention on both an observation by a state psychologist, Dr. Peter McClusker, that she "would have considerable difficulty tolerating stress and pressures," (tr. 148), and a ruling[4] from the Social Security Administration that that "[a]ny impairment-related limitations created by an individual's response to demands of work . . . must be reflected in the RFC assessment." SSR 85-15, 1985 WL 56857, at *6 (1985). Since the Social Security ruling states that how one responds to stress "is highly individualized" and can "make performance of an unskilled job as difficult as an objectively more demanding job," id., Packard contends that the ALJ was required to conduct an individualized inquiry into her ability to handle employment-related stress. The Third Circuit has held, however, that a single, passing reference to a claimant's difficulty in handling stress does not trigger the necessity of an individualized inquiry, particularly when unaccompanied by documentation in the record. Burns v. Barnhart, 312 F.3d 113, 130 (3d Cir. 2002). The facts of this case are analogous to those present in Burns, and, accordingly, the ALJ was under no duty to conduct an individualized inquiry.

**IV.   Conclusion**

For the foregoing reasons, and after careful consideration of all of the parties' arguments, Packard's request for review is DENIED and his Complaint is DISMISSED with prejudice.

An appropriate Order follows.

O:\CIVIL 11\11-7323 Packard v. Astrue\11cv7323_memo.wpd

---

[4] "Social Security Rulings are agency rulings published under the authority of the Commissioner of Social Security and are binding on all components of the Administration." Sullivan v. Zebley, 493 U.S. 521, 531 n. 9 (1990).